# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

DONALD A. BREGIN,                             )
                                              )
    Plaintiff,                            )
                                              )
    v.                                    )          CAUSE NO.: 1:06-CV-23-TS
                                              )
LIQUIDEBT SYSTEMS, INC., and                  )
SIRVA, INC.,                                  )
                                              )
    Defendants.                           )

## OPINION AND ORDER

Defendant Liquidebt Systems, Inc., (LSI), is an accounts receivable management and commercial collection agency. In 2003, Defendant SIRVA, Inc., outsourced its debt collection function to LSI and entered into a contract to govern the relationship. LSI hired the Plaintiff, Donald A. Bregin, to manage LSI's account with SIRVA. The Plaintiff claims that, because he complained about illegal accounting practices by SIRVA, his boss at LSI removed him from the account at the insistence of SIRVA representatives. A little over one month later, LSI terminated his employment. The Plaintiff claims that this, too, was the result of his complaints and pressure from SIRVA. He claims that SIRVA wanted to silence him because it was planning an initial public offering (IPO) that could be derailed by any criticism of its accounting and that LSI was motivated by a desire to keep the SIRVA contract.

The Defendants deny that SIRVA committed any illegal accounting practices. They acknowledge that the Plaintiff had a dispute with SIRVA about its accounts receivable numbers, but contend that the dispute related solely to the impact the accounts receivable numbers had on the contractual formula used to measure LSI's collection performance. The Defendants submit that LSI, including the Plaintiff, had no role in creating SIRVA financial reports. LSI maintains

that it alone decided to remove the Plaintiff from the account and did so for legitimate business reasons: he performed poorly and failed to meet the collection goals set forth in the SIRVA/LSI contract. After his removal, LSI gave the Plaintiff an opportunity to continue his employment with LSI if he generated new business for LSI. When he failed in this endeavor as well, LSI could not justify the Plaintiff's salary and terminated his employment.

The Defendants have moved for summary judgment on all the Plaintiff's claims. LSI also moves for summary judgment on its counterclaim against the Plaintiff for $30,000 that it alleges the Plaintiff obtained by making false representations about LSI's performance under the outsourcing contract. The Plaintiff contends that summary judgment is not appropriate because Indiana recognizes a claim for retaliatory discharge of an at-will employee and that a jury could believe that the Defendants acted because of retaliatory motive. He also submits that the evidence supports his claim that SIRVA interfered with his employment relationship with LSI. Also before the Court are the Defendants' motions to strike portions of the Plaintiff's statement of genuine issues, his affidavit, and the accompanying exhibits.

## BACKGROUND

On January 3, 2006, the Plaintiff filed his suit against LSI and SIRVA in Allen Superior Court. In his Complaint, the Plaintiff alleges that LSI terminated his employment in retaliation for "discovering, objecting to, and refusing to participate in illegal accounting activities or the coverup of those illegal accounting activities." (Pl. Compl. ¶ 8.) He states that this termination "was in violation of the laws and public policy of the state of Indiana." (*Id.*) He alleges that SIRVA pressured LSI to terminate him, which constituted tortious interference with his

employment contract with LSI. (*Id.* ¶ 9.)

On January 23, 2006, the case was removed to federal court. On March 10, LSI answered the Complaint and filed a counterclaim against the Plaintiff alleging that he made material misrepresentations to LSI concerning the status of the success of the collection efforts on the SIRVA account. LSI alleges that contrary to the Plaintiff's representations, LSI did not qualify for a bonus payment from SIRVA, but was instead assessed a $150,000 penalty, and that the Plaintiff should have known that his representations were false and that LSI would rely on them. LSI contends that it relied upon the Plaintiff's misrepresentations to grant the Plaintiff's request for $30,000 in additional compensation. LSI requests damages in the amount of $30,000 plus interest, costs, and expenses. On March 14, SIRVA answered the Complaint.

On February 12, 2007, LSI moved for summary judgment on the Plaintiff's claims and also on its counterclaim for $30,000. On this same date, SIRVA requested summary judgment. On July 23, the Plaintiff filed his brief in opposition to the Defendants' summary judgment motions. On August 24, LSI moved to strike the appendix the Plaintiff filed in response to its summary judgment motion and filed its reply. On this same date, SIRVA filed a similar motion to strike and also filed its reply. The Plaintiff opposed the motions to strike, and on September 14  and 21, LSI and SIRVA replied to the Plaintiff's response to their motions to strike.

On December 3, the Court conducted a ruling conference in which it granted the Defendants' motions for summary judgment on the Plaintiff's Complaint allegations. The Court withheld ruling on LSI's motion for summary judgment on its counterclaim against the Plaintiff. This Opinion and Order explains the Court's ruling.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (amd. effective Dec. 1, 2007).[1]

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). The evidence the nonmovant relies on must be identified with reasonable particularity and must be "competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996); *see also*

---

[1] On December 1, 2007, amendments to the Rules of Civil Procedure became effective. These amendments clarify and simply the rules without changing their substantive meaning. *See* Rule 56, 2007 Amendment Committee Note ("The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.").

*Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986) (stating that when evidence is offered through exhibits on a summary judgment motion, those exhibits "must be identified by affidavit or otherwise admissible").

A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is not sufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). A court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

## STATEMENT OF FACTS

### A.    Overview—General Timeline of Events

LSI provides accounts receivable management services, including the collection of past

due accounts, for companies that outsource these services to LSI. LSI hires and manages

employees to call and request payment on its clients' delinquent accounts receivables. LSI does

not handle any funds on behalf of its clients. All collection payments are made directly to the

client. James Drolshagen is the President and sole shareholder of LSI. Tom McKenna is the

Director of Client Relations.

SIRVA provides relocation and moving services. North American Van Lines, Inc.,

(NAVL) is a subsidiary of SIRVA. The Plaintiff worked at NAVL in a collections function until

about 1996. The Plaintiff later worked as a consultant for SIRVA in its credit and collection area

from April 29, 2001, until November 2002. He was hired on a temporary basis to identify ways

SIRVA could improve its performance on collecting accounts receivable. Near the end of his

consultation period, the Plaintiff provided a Master To-Do List to SIRVA. During his

preparation of the List, the Plaintiff reported that internal reports for accounts receivable were

incorrect. He believed that including monies that should have been refunded to customers in

accounts receivable understated that category.

In mid-2002, NAVL decided to outsource its collection of accounts receivable owed by

the customers of its moving services. LSI negotiated with NAVL to provide collection services

for NAVL and other related entities.[2] The Plaintiff, while still at SIRVA, was involved in the

contract negotiations and was involved in determining and setting the benchmarks to evaluate

LSI's performance under the Agreement for Outsourcing Services (the Contract). LSI expressed

an interest in hiring the Plaintiff to oversee the SIRVA account because of his familiarity with

---

[2] For ease of reference, the parties and this Court use SIRVA instead of NAVL to refer to the contracting party.

the company and its employees. SIRVA supported this decision. In December 2002, LSI hired the Plaintiff as a consultant and when the Contract went into effect, on January 1, 2003, LSI hired the Plaintiff as the vice president of operations to manage the Contract between LSI and SIRVA. LSI considered the Plaintiff the SIRVA Project Manager. The Plaintiff was an employee of LSI and did not have any continued contractual or employment relationship with SIRVA.

Under the Contract, LSI was responsible for collecting SIRVA's outstanding customer accounts. LSI employees were to contact SIRVA's customers as soon as a SIRVA invoice became past due to request payment and to resolve payment disputes. As with its other accounts, LSI employees did not handle any money and all payments were made directly to SIRVA. LSI had no input regarding how SIRVA's accounts were calculated, how money was applied, or how refunds and credits were handled.

To evaluate LSI's performance, SIRVA measured how fast receivables were collected, referred to as days sales billed (DSB). The DSB formula, the number of days billed but not yet collected, was used exclusively for the LSI/SIRVA contract and did not have any other application to LSI or SIRVA. Under the Contract, LSI's performance goal was to improve SIRVA's accounts receivable performance by 10% during 2003 (the Benchmark). The 2003 DSB would be compared to the 2002 DSB to determine if LSI met the Benchmark. The Contract provided incentives for exceeding the Benchmark and penalties for failing to meet the Benchmark. The maximum penalty LSI would be required to pay if it failed to reach the Benchmark was $150,000. Likewise, the maximum incentive it could receive was $150,000.

SIRVA regularly reviewed LSI's performance using the DSB metric described in the Contract. The numbers provided by SIRVA as part of the DSB calculation were used solely to

measure LSI's collection performance; they were not published financials and did not have any impact on SIRVA's financial reporting. (Gathany Dep. 21; Bokar Dep. 11–12.) During the spring and summer 2003, LSI's performance numbers under the Contract were poor and it appeared that LSI was failing to lower the DSB. SIRVA expressed concerns to LSI and the Plaintiff about this performance per the DSB as well as their failure to provide SIRVA with certain reports. The Plaintiff believed that the combination of SIRVA's accounting practice of including customer overpayments in accounts receivable and its large refund payout to customers in 2003 resulted in a DSB that did not accurately reflect LSI's performance. His opinion was that, after the cash refunds, the receivables used in the 2003 calculations were not comparable to the 2002 calculations against which LSI was measured and expected to improve. The Plaintiff repeatedly discussed his concerns with Drolshagen and McKenna at LSI and made several requests to SIRVA to recalculate the DSB formula.

At the Plaintiff's insistence, SIRVA agreed to consider changing the calculations used to measure LSI's performance. However, when SIRVA recalculated the Benchmark in June, it did not have a significant impact. The improvement was not enough to meet the Benchmark. (Bokar Dep. 14–16, 19–21, 26.)

SIRVA continued to express concerns to the Plaintiff and to Drolshagen about LSI's performance and also about the Plaintiff's leadership and lack of responsiveness. SIRVA became doubtful that LSI could meet the Contract goals. The Plaintiff continued to express his belief that it was SIRVA's numbers that created the perception that LSI was not performing.

On November 13, 2003, Drolshagen removed the Plaintiff from the SIRVA account and made Sue Doeden the point person. The Plaintiff continued to draw a salary from LSI and was

still considered the vice president of the Fort Wayne operation. In December, Drolshagen terminated the Plaintiff's employment with LSI.

LSI did not meet the Benchmark in 2003 and was assessed a $150,000 penalty under the Contract.

**B.      Detailed Account**

**1.      Parties/Personnel**

LSI hired the Plaintiff to manage the SIRVA account because he had experience with SIRVA and was present during the SIRVA/LSI contract negotiations. LSI believed that it would be a seamless transition from internal accounts receivable to externally outsourced accounts receivable if the Plaintiff was overseeing the project. The Plaintiff's responsibility at LSI was to achieve the Benchmark by managing the staff LSI hired to oversee and make collection calls and by making sure the overall status of collection of accounts receivable was moving in the right direction. The Plaintiff was not in a position to verify or authenticate SIRVA's financial numbers.

Ken Bokar was the Treasury Director at SIRVA. Doug Gathany was his immediate supervisor. Bokar was responsible for working with the Plaintiff to support and provide input to achieve the Contract goals. He was the primary liaison between SIRVA and LSI until September 2003. After that date, Ann Loesch became the contact person at SIRVA.

**2.      LSI's Performance—The Dispute Regarding DSB**

The Plaintiff testified in his deposition that the relationship between SIRVA and LSI was

strained from the beginning, but became even more so by May 2003. (Pf. Dep. 112.) On May 27,

2003, Gathany sent the Plaintiff an email requesting collection results for April. The Plaintiff

agrees that Bokar was not receiving the reporting that he wanted, even though there were weekly

teleconference meetings between LSI and SIRVA. (Pf. Dep. 121.)  On several occasions

throughout 2003, SIRVA made requests for increased responsiveness and improved processes.

(Pf. Dep. 142.) SIRVA created a DSB statement each month to monitor LSI's performance.

According to the Plaintiff, SIRVA believed that LSI was not performing and LSI believed that

non-LSI controllables were responsible for the poor numbers. (Pf. Dep. 114.) The Plaintiff

wanted to recalculate the numbers to show that LSI was improving. The Plaintiff believed that

restating the numbers would show that LSI was not failing and would "change the entire

perception of what LSI's performance was." (Pf. Dep. 123.)

In a May 27, email from Gathany to the Plaintiff and McKenna at LSI, Gathany writes:

> The attached file shows where we are for the month of April. The results
> are clearly unacceptable. We are not only falling significantly short of the 10%
> DSB improvement committed to in the contract, but in most cases we are worse
> than last year. I know there are some issues relating to the calculation of the DSB,
> but while the magnitude may change when the numbers are corrected, the
> conclusion is still the same—we are not where we need to be.

(Pf. Dep. Ex. 68.) The Plaintiff responded to this email by indicating that there was a "bust" in

the calculation of the numbers. (*Id.*)

On June 12, 2003, Bokar produced a performance report itemizing problems in the

SIRVA/LSI relationship. The Plaintiff admits that the report depicts LSI as a "total failure" but

states that he and Bokar were working to redesign reports and to recalculate DSB because it was

flawed. (Pf. Dep. 122.) The Plaintiff asked Bokar if the report was for "nostalgic purposes"

because he thought they were not using the same numbers anymore but had agreed to make

10

certain adjustments to the contractual metric. (Drolshagen Dep. Ex. 3.) Bokar believed the

Plaintiff's response was flippant, and responded that until they agreed on a revised calculation,

those were the numbers LSI would be measured on per the Contract. (*Id.*) The Plaintiff testified

that Bokar's criticism of LSI increased during this time and that this was a result of SIRVA

executives wanting to improve the process and hit the cash goal. (Pf. Dep. 127.)

On June 13, Gathany sent Drolshagen an email providing background information to put

in context "some serious concerns I have about the direction the SIRVA-LSI relationship is

headed." (Drolshagen Dep. Ex. 2.) He attached Bokar's report to the email. Gathany admitted

that some refund issues impacted the results, but that LSI was worse than the previous year for

every line of business and well below the 10% improvement commitment. Gathany expressed

concern regarding the Plaintiff's continual focus on changing the metric used to evaluate LSI's

performance instead of improving collections. He stated that "most importantly," the project

"lacks leadership from a day-to-day management perspective." (Drolshagen Dep. Ex. 2.)

Drolshagen responded to Gathany by informing him of measures LSI was taking to

address SIRVA's concerns. He advised that he had informed the LSI management team to focus

on the numbers that LSI controlled and on LSI's performance under the Contract. Drolshagen

also instructed McKenna to take the lead in communicating with SIRVA. On June 18,

Drolshagen told all LSI professionals to stop complaining about SIRVA's accounts and to

concentrate on LSI's performance.

The Plaintiff testified that in June 2003 he was "forced to do a complete project review

internally with all my management staff and come back with some answers that were going to

appease SIRVA and let them know we're progressing forward to solve their problems and

11

address their requests." (Pf. Dep. 143.) The Plaintiff believed that this was in retaliation for challenging the accounts receivable numbers.

In July, Gathany met with Drolshagen to evaluate the SIRVA/LSI relationship. Gathany testified that Drolshagen responded with a "commitment to get the senior management at LSI more involved to monitor the progress and to achieve the year-end goals." (Gathany Dep. 39.) Gathany continued to have discussions with the Plaintiff and Drolshagen regarding LSI's performance.

In September 2003, Anne Loesch began working for SIRVA as the Vice President of Global Credit. Loesch was responsible for accounts receivable, including the collection of past due balances. She replaced Bokar as the SIRVA manager over the SIRVA/LSI relationship.

In early October, Loesch discussed with the Plaintiff what she wanted him and his team to focus on in terms of LSI's accounts receivables management and collection process on the SIRVA account. Loesch also raised concerns with Drolshagen and the Plaintiff about the Plaintiff's availability and his responsiveness. The Plaintiff contends that Loesch unfairly expected him to be available whenever she called or emailed. (Pf. Dep. 145, 149.) However, the Plaintiff does not believe Loesch had any retaliatory motive.

Loesch discussed with Drolshagen problems she had with the Plaintiff's management, including response time to emails and voicemails, failure to identify issues and book time with her to discuss them, making excuses instead of providing analysis and substantiating problems, not being proactive and driving the process, and not working with a sense of urgency. Loesch stated that, to improve the relationship, SIRVA was responsible to provide accurate cash and DSB goals. Drolshagen communicated to the Plaintiff that he needed to work on his leadership

abilities and management skills.

In mid-November, LSI hired Sue Doeden to work on the SIRVA project. The Plaintiff had recruited Doeden and was her direct supervisor. On November 11, 2003, the Plaintiff introduced Doeden to Loesch during a telephone call. During this call, the Plaintiff again expressed his concern that the DSB reports were incorrect and that he wanted to change the formula. The Plaintiff contends that Loesch responded that she could not believe that after ten months, the Plaintiff still was not agreeing to the numbers. The Plaintiff states that after they debated why LSI's results were so poor, Loesch advised the Plaintiff that she wanted to have lunch with Drolshagen and had an idea that would make the SIRVA/LSI relationship better.

After this call and after informing LSI of her dissatisfaction with the Plaintiff's responsiveness, Loesch had a meeting with Drolshagen. He stated that Doeden would be the new point person going forward.


**3.      Recalculation of DSB**

In fall 2003, Drolshagen asked McKenna to independently evaluate the effect of the refunds the Plaintiff complained about on the performance metric and the Benchmark. It was his intention that, if the Plaintiff's complaints were well founded, to demand relief from the penalty provisions in the Contract. McKennan determined that even with the changes, LSI's performance was so poor that it would be subject to the $150,000 penalty.

In response to the Defendants' assertions that changing the accounts receivable numbers did not materially change LSI's performance, the Plaintiff wrote, "Those 2003 results, when adjusted for the accounting irregularities, as well as, the removal of certain customer refunds and

overpayments to income, caused the Contract to reflect poorly. SIRVA did not make all

contractual adjustments to the 2003 results as written by Drolshagen in his e-mail to Gathany."

(Stmt. Genuine Issues, DE 78 ¶ 10.) The Plaintiff cites paragraphs 10, 12, 14, 19, 20, 25, 27, 28,

30, 31, 32, 33, 35, 38, 43, 44, 46, 48 & 49 of his affidavit in support of these statements. The

Defendants move to strike this response on the grounds that it is unsupported by proper citation

to admissible evidence and is hearsay. Defendant SIRVA writes:

> Bregin seems to argue that his performance under the contract remained
> poor because "SIRVA did not make all contractual adjustments to the 2003
> results." He offers absolutely no admissible evidence on this point. At most, he
> offers bald statements based entirely on hearsay. (Bregin Aff., ¶¶ 19 (claiming
> that account receivable "were agreed to be incorrect and requiring revision by LSI
> and SIRVA" without any supporting evidence other than a lone e-mail drafted by
> Bregin himself), 25 (claiming that "Bokar stated . . . that Gathany agreed to
> restate the 2002 accounts receivable numbers for SIRVA" without any supporting
> evidence other than a lone e-mail drafted by Bregin himself). This evidence
> cannnot be considered. *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 563 (7th
> Cir. 1998) ("hearsay is inadmissible in summary judgment proceedings to the
> same extent that it is inadmissible in a trial"); *McGivern v. City of Indianapolis*,
> 2003 U.S. LEXIS 14555, *6 (S.D. Ind. 2003) (same).

(SIRVA Mot. Strike 11.) The Court agrees with SIRVA's arguments.[3] The Plaintiff's statement

of fact is a conclusion unsupported by admissible evidence. He does not identify the other

contractual adjustments or provide evidence that they would be appropriate. Moreover, the

statement, even if true, states only that SIRVA "did not make all contractual adjustments." The

Plaintiff does not even attempt to establish how inclusion of all these (unspecified) adjustments

---

[3] As indicated in the background section of this Opinion and Order, the Defendants have each filed a
motion to strike the Plaintiff's appendix, Statement of Genuine Issues, affidavit, and exhibits thereto. Rather than
discuss each and every statement and exhibit that the Defendants' challenge, the Court will discuss evidentiary
material as required to determine if genuine issues of material fact preclude summary judgment. "[I]t is the function
of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of
genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions,
and assertions unsupported by the documented evidence of record offered in support of the statement." *Mayes v. City
of Hammond*, 442 F. Supp. 2d 587, 596 (N.D. Ind. 2006).

would have elevated LSI's performance to the 10% Benchmark. His response does not adequately dispute that changing the metric did not significantly alter LSI's performance. Therefore, for purposes of summary judgment, it is undisputed that LSI did not meet the Benchmark using the formula agreed to by the parties in the Contract, even as modified to account for customer refunds.

### 4.     The Plaintiff's Removal from the SIRVA Account

On November 13, Drolshagen removed the Plaintiff from the SIRVA project and informed SIRVA that the Plaintiff would no longer be working on its account. The Plaintiff did not have any further contact with SIRVA. Drolshagen testified, regarding his decision to remove the Plaintiff from the SIRVA account, that he decided that the Plaintiff could not do the job because instead of decreasing DSB by 10%, it increased by 10%. (Drolshagen Dep. 19.) This meant that LSI would incur the $150,000 penalty under the Contract. Drolshagen described the results as "extremely poor" and a "monumental failure." (*Id.*) He stated that, in addition, the Plaintiff did not provide strong management, drive performance, or make any changes to improve performance. (*Id.* 21–23.) Instead, the Plaintiff always pointed to what SIRVA was doing wrong. (*Id.* 22.) Drolshagen had received complaints from Bokar and Loesch about these very things. Loesch also complained about the Plaintiff's lack of responsiveness and failure to follow-up on task lists. (*Id.* 23–25.)[4] Drolshagen testified that no one at SIRVA requested that the Plaintiff be removed from the project. MeKenna also testified that SIRVA did not make any such request. (McKenna Dep. 19.) According to the Plaintiff, Drolshagen told him that he would

---

[4] The Plaintiff claims that there was constant communication between LSI and SIRVA. However, he does not dispute that Loesch genuinely believed that his level of responsiveness was inadequate. (Pl. Dep. 145.)

not have been able to maintain the SIRVA contract if the Plaintiff was kept on it.

Doeden became the SIRVA project manager.

**5.      The Plaintiff's Termination**

After Drolshagen removed the Plaintiff from the SIRVA project, he told the Plaintiff that

if he could bring in customers, he could maintain his position at LSI. (Drolshagen Dep. 25; Pf.

Dep. 225 (tesifying that he was told to focus on sales).) Drolshagen also explained that the

Plaintiff told him that other companies wanted to hire him, so he "didn't want to cut him off the

payroll until he had a chance to contact one of these companies and find a better job." (*Id.*

25–26.) LSI continued to pay the Plaintiff his $110,000 annual salary. The Plaintiff did not bring

in any new business and on December 19, Drolshagen terminated the Plaintiff's employment

after he turned down an opportunity to resign. The decision was a financial one and no one else

participated in the decision to terminate the Plaintiff. (*Id.* 27; Drolshagen Aff. ¶ 19; Gathany Aff.

¶ 11 (stating that he was not involved in LSI's decision to terminate the Plaintiff's

employment)). Drolshagen testified that the $150,000 penalty required him to lay off four other

employees beginning in January 2004 to reduce expenses.

The Plaintiff claims that SIRVA pressured LSI to terminate the Plaintiff. He states that

SIRVA was motivated by a desire to keep the Plaintiff quiet about its accounting numbers

because it was preparing for an IPO of its stock in November 2003.[5]

**6.      2003 Penalty Payment**

---

[5] Even though the Plaintiff has not supported his affidavit statement that SIRVA was preparing for a November IPO with admissible evidence, the Court will assume, for purposes of summary judgment that an IPO was scheduled to occur in November 2003.

LSI was required to pay $150,000 as a penalty for failing to meet the Benchmark in 2003. SIRVA allowed LSI to make monthly payments, paying SIRVA $12,500 per month from January 1, 2004, until December 1, 2004.

The Plaintiff still believes that the only reason LSI did not meet the 2003 contract goals is because SIRVA did not restate the accounts receivable numbers and other uncontrollables. (Pf. Dep. 239–40.) He also contends that, in 2004, LSI received an increased monthly fee that should not have occurred until 2006, which had the effect of offsetting the penalty. The designated evidence in support of this statement is the Plaintiff's affidavit, in which he refers to two exhibits. The first is an email that confirms that LSI was assessed the $150,000 penalty, but that it would be payable in monthly installments by decreasing the monthly payment from SIRVA to LSI for its services. The monthly payment from which the penalty is deducted contains a 2.8% cost of living adjustment. The Court assumes that this is the increase the Plaintiff is referring to. However, he has not presented any evidence that this was an increase that should not have occurred until 2006 or that LSI would not have been entitled to it even absent the penalty. The second exhibit purports to be an excerpt from a document titled "SIRVA LSI Timeline." It is an unauthenticated document containing, presumably, the Plaintiff's notes about a December 18, 2003, telephone conference. There is no indication when the notes were recorded, or how the author has knowledge of the events recorded. The exhibit is not admissible evidence. Even if it was admissible, the exhibit does not provide any information that would support the Plaintiff's contention that LSI received an increased monthly fee that should not have occurred until 2006. That LSI was required to pay $150,000 as a penalty for failing to meet the Benchmark in 2003 is an undisputed fact in the record before this Court.

**7.      The Plaintiff's Request for Additional Payment**

In spring and summer 2003, LSI was not meeting the Benchmark using the contractual DSB. Drolshagen testified in his affidavit that, during this time, the Plaintiff assured him that LSI would meet the Benchmark. The Plaintiff expressed his concern that SIRVA was misreading its accounts receivable numbers and that if the errors were corrected, LSI's performance would meet the Benchmark. The Plaintiff sought numerous advances on his bonus. One such request was recorded in a June 9, 2003, email from the Plaintiff to Drolshagen. According to the email, the Plaintiff requested additional funds because his salary was not sufficient to meet his living needs. Drolshagen stated in his affidavit that he relied on the Plaintiff's predictions regarding the DSB to pay the Plaintiff an addition $30,000 that he would not have received if LSI did not meet the Benchmark.

**8.      Miscellaneous Facts**

The facts presented in this Opinion and Order do not represent the full extent of the facts presented in the parties' briefs. However, consistent with summary judgment procedure, these are  the presented facts that are supported by admissible evidence and necessary to determine whether the Plaintiff's claims should be decided by a jury. As will be highlighted in the legal analysis, the most pertinent facts for the retaliatory discharge claim are those regarding the nature and substance of the Plaintiff's complaints and the scope of his risk of personal liability for SIRVA's purported accounting errors. The facts relevant to the tortious interference claim are those regarding SIRVA's involvement in LSI's termination decision. Because the record on these matters establishes that no triable issue of fact exists, the Court need not address all the

facts presented by the parties' briefs, even if some of those facts would provide additional grounds to grant the Defendants' motions for summary judgment.[6]

## DISCUSSION

The Defendants assert the statute of limitations as a defense to the Plaintiff's claim that his removal from the SIRVA account was in retaliation for complaining about SIRVA's accounting methods. They argue that any such claim is barred because his removal in November 2003 occurred more than two years before the Plaintiff filed his lawsuit in December 2005.

The Plaintiff does not dispute that Indiana's two-year statute of limitations applies to his retaliation claim. *See* Ind. Code § 34-11-2-1 ("An action relating to the terms, conditions, and privileges of employment except actions based upon a written contract (including, but not limited to, hiring or the failure to hire, suspension, discharge, discipline, promotion, demotion, retirement, wages, or salary) must be brought within two (2) years of the date of the act or omission complained of."). In response to the Defendants' argument that he did not timely challenge his removal from the SIRVA account, the Plaintiff states, "It is uncontested that [he] was terminated on or after December 19, 2003. The Complaint was filed on December 16, 2005." (Plf. Brief 16.)  The Plaintiff's response ignores his removal from the account as an actionable event and discounts the Defendants' arguments in only two sentences. However, this focus on his date of termination is consistent with the Complaint allegations. The Complaint

---

[6] For example, the Court need not decide whether SIRVA's accounting methods were actually in violation of any law or whether the Plaintiff is qualified to testify to this effect. These points are not outcome determinative because the Plaintiff's responsibilities with regard to the matters he complained about did not place him in the category of protected employees who cannot be terminated in retaliation for their actions. Thus, even if the Plaintiff could be qualified as an expert or had retained an expert to testify about SIRVA's accounting practices, it would make no difference to the viability of his claims.

mentions the Plaintiff's removal from the SIRVA account in November 2003, but it alleges only that his "termination" from LSI was "in violation of the laws and public policy of the state of Indiana" and that SIRVA's action in causing his "termination" represents "tortious interference" with his employment contract with LSI. (Plf. Compl. ¶¶ 8–9.)

Thus, it appears from the Complaint and the Plaintiff's response to the Defendants' statute of limitations argument that he challenges only his termination and concedes that the Defendants' actions in November 2003 are time-barred. Yet, both his response brief and supporting affidavit are replete with references to his removal from the SIRVA account. The Plaintiff even refers to it as a demotion. (Plf. Brief 14.) Therefore, for clarification, the Court expressly holds that any challenge to the November demotion is untimely. Whether the Plaintiff's removal as the SIRVA account manager constituted unlawful retaliation is not before the Court.

The Court also clarifies that because LSI, not SIRVA, was the Plaintiff's employer, his retaliatory discharge claim is brought against Defendant LSI only. *See Wilmington v. Harvest Ins. Cos.*, 521 N.E.2d 953, 956 (Ind. Ct. App. 1988) (stating that the narrow exceptions to the employment at will doctrine applied "to employees only"). As to the tortious interference claim, a party to a contract is generally not subject to liability for tortious interference with its own contract. *See Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 n.7 (Ind. 1994) (citing *Kiyose v. Trustees of Ind. Univ.*, 333 N.E.2d 886, 891 (Ind. Ct. App. 1975)). However, a party to the contract can be subject to liablity for conspiring with another party to tortiously interfere with the contract. *Id.* (citing *Wade v. Culp*, 23 N.E.2d 615, 617 (Ind. Ct. App. 1939)). Here, the Plaintiff alleges that the Defendants acted jointly and conspired to terminate him. Thus, the

Court will analyze the tortious interference claim against both LSI and SIRVA.

### A.     Retaliatory Discharge

The Plaintiff's claim that he was wrongfully discharged is brought pursuant to Indiana law. Traditionally, Indiana has recognized two forms of employment: (1) employment at will; and (2) employment for a definite or ascertainable time. *Orr v. Westminster Village N., Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). The parties agree that the Plaintiff's employment with LSI was at-will. Therefore, under Indiana's employment at will doctrine, both he and LSI were permitted to terminate the employment at any time for "good reason, bad reason, or no reason at all." *Meyers v. Meyers*, 861 N.E.2d 704, 706 (Ind. 2007) (quoting *Montgomery v. Bd. of Trustees of Purdue Univ.*, 849 N.E.2d 1120, 1128 (Ind. 2006)).

Indiana courts have recognized public policy exceptions to the employment at-will doctrine, but only on "rare occasions." *Meyers*, 861 N.E.2d at 706. In *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973), the Indiana Supreme Court, noting that "Indiana Worker's Compensation Act expressly provides that 'no rule, regulation, or other device shall, in any manner,' relieve an employer from the obligations imposed by the Act," 861 N.E.2d at 706 (quoting *Frampton*, 296 N.E.2d at 427–28) "found that the threat of discharge was such a 'device,'" and  "held that 'an employee who alleges he or she was retaliatorily discharged for filing a claim' under the Act 'has stated a claim upon which relief can be granted,'" *id.* (quoting *Frampton*, 297 N.E.2d at 427–28). In *Meyers*, the Indiana Supreme Court recently reaffirmed the narrowness of the public policy exception when it stated that "[t]he decisions during the intervening thirty years have made it plain that this language is intended to recognize quite a

limited exception." *Id.*

> Other than the *Frampton* exception, which is grounded on express statutory
> language, the Indiana appellate cases permitting retaliatory discharge actions have
> generally involved plaintiffs allegedly terminated in retaliation for refusing to
> violate a legal obligation that carried penal consequences. *See, e.g., McClanahan*
> [*v. Remington Freight Lines, Inc.*], 517 N.E.2d [390,] 393 [Ind. 1988]; *McGarrity
> v. Berlin Metals*, 774 N.E.2d 71, 78-79 (Ind. Ct. App. 2002) (holding retaliatory
> discharge claim was viable where employee alleged he was fired for refusing to
> file fraudulent tax return), trans. denied; [*Call v.*] *Scott Brass*, 553 N.E.2d at 1225,
> 1226 [Ind. Ct. App. 1990)] (permitting employee's claim that her former
> employer dismissed her because she complied with a summons for jury duty);
> *Haas Carriage, Inc. v. Berna,* 651 N.E.2d 284, 288 (Ind. Ct. App. 1995)
> (upholding claim by employee alleging discharge for refusing to haul unlawful
> load), trans. not sought. *But see, e.g., M.C. Welding & Machining Co. v. Kotwa*,
> 845 N.E.2d 188, 195 (Ind. Ct. App. 2006) (citing employer's concession and
> failure to object to instruction as basis for upholding relief in action for wrongful
> discharge in retaliation for employee's claim for unemployment benefits).

*Meyers*, 861 N.E.2d at 707.

This means that, in Indiana, an employer's decision to discharge an at-will employee

does not fall within a recognized exception to the employment at-will rule unless the plaintiff

demonstrates "that he was discharged in retaliation for either having exercised a statutorily

conferred personal right or having fulfilled a statutorily imposed duty." *Campbell v. Eli Lilly &

Co.*, 413 N.E.2d 1054, 1061 (Ind. Ct. App. 1980) (holding that employee's complaints to

superiors about allegedly hazardous nature of its products was not fulfillment of statutorily

imposed duty or right); *see also Ryan v. Underwriters Labs., Inc.*, No. 1:06-w-1770-JDT-TAB,

2007 WL 2316474 at *9 (S.D. Ind. Aug. 8, 2007) (summarizing requirement for public policy

exception to at-will employment under Indiana law to require a plaintiff to show that he was

fired either for "(1) exercising a specific right and a statute (or constitutional provision) [that]

clearly restricts the employer's ability to terminate the employee for exercising this right or (2)

fulfilling a specific duty for which the law imposes criminal penalties upon those who fail to do

so").

Here, the Plaintiff invokes the second exception, which applies when an employee fulfills a duty for which the law imposes personal liability. The Court finds that because no reasonable jury could find for the Plaintiff on this theory of recovery, LSI is entitled to summary judgment.

The Plaintiff has not identified any illegal act that SIRVA or LSI asked him to personally commit or be a party to, nor has he identified any obligation that he fulfilled that, had he not done so, would have exposed him to personal liability. In short, the Plaintiff was not "faced with the choice of losing [his] job or committing an illegal act." *McClanahan*, 517 N.E.2d at 393. The "overriding theory" of the Plaintiff's case undermines any claim that he was fired for refusing to do some illegal act.  (Plf. Br. 4) (stating that the "overriding theory" of his case is that "SIRVA, in preparation for its IPO, could not allow allegations of misleading financial accounting" because it would "derail the IPO"). He argues that he was fired  to "prevent negative communication which could affect the IPO." (Plf. Brief 2). His own deposition testimony is that he was asked to "ignore" and "quit discussing" accounting improprieties, and he believed that he could not lawfully "stay silent." (Pl. Dep. ¶¶ 48, 50.) Thus, the Plaintiff's theory of his retaliatory discharge claim is, not that he was asked to participate in illegal conduct but, that he could have been penalized for remaining silent about SIRVA's accounting practices.

This argument fails because the Plaintiff has not explained how his collection responsibilities, which SIRVA outsourced to LSI, gave him any influence over SIRVA's accounting methods or financial statements. Without such influence over the numbers, it is inconceivable that he would be personally liable for them. The record establishes that the Plaintiff's responsibility was to collect SIRVA's outstanding accounts receivables by managing

23

the LSI staff hired to make telephone calls to SIRVA customers on outstanding accounts. The

Plaintiff admitted in his deposition that he was never in a position where he was required to

authenticate or verify any financial statements of SIRVA. (Pf. Dep. 50.) *See also id.* at 89

(agreeing that he had no responsibility with respect to 2002 or 2003 financial reporting). The

Plaintiff complained about the DSB, but he does not establish that the DSB was related to

SIRVA's financial statements. In response to the Defendants' evidence that the measurement of

LSI's performance was unrelated to SIRVA's published financial statements, the Plaintiff states,

> While it is true that SIRVA exclusively determines how its accounts receivable
> are calculated and how money is applied as income and how refunds and credits
> are handled for customers and LSI handles no money for SIRVA, that does not
> abrogate the fact that Bregin, knowing what SIRVA was doing, would have to
> continue the conspiracy and stand by silently. SIRVA acknowledges its failure to
> accurately state its financial figures. SIRVA admitted it couldn't reconcile its
> numbers and should have restated them. In an objective sense, the DSB metric
> was a start, but only if the "uncontrollables" were taken into account and SIRVA
> didn't manipulate the numbers. [App. of Pl. Bregin Aff. ¶ 19, 21, 23, 25, 27, 31,
> 38, 43, 46 & 49].

(Plf. Stmt. Genuine Issues ¶ 18.) The Plaintiff, in this response, does not dispute that the

measurement of LSI's performance was unrelated to SIRVA's published financial statements.

He then goes on to present argument (not evidence) that this fact does not mean that he could not

have been responsible for a "conspiracy" if he did nothing to stop SIRVA.

Not only is the Plaintiff's own affidavit testimony the sole support for this contention, but

the Plaintiff has improperly inserted factual and legal argument into his Statement of Genuine

Issues. *See Mayes v. City of Hammond,* 442 F. Supp. 2d 587, 595 (N.D. Ind. 2006) (stating that

Local Rule 56.1 Statement of Genuine issues was "not intended as a forum for factual or legal

argument") (quoting *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000)). The Plaintiff's

statement does not, as is required, "alert the court to precisely what factual questions are in

dispute and point the court to the specific evidence in the record that supports" his position that he could have been considered a part of an unlawful conspiracy. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994) (holding that the factual statements required by local summary judgment rules are "not merely superfluous abstracts of the evidence"). The last sentence of the Plaintiff's response, regarding the DSB, is not helpful given his failure to tie the DSB to SIRVA's financial reporting requirements. In fact, when asked in his deposition to identify the part of the SIRVA/LSI contract that allowed LSI to demand that SIRVA amend or restate its publicly filed numbers, the Plaintiff answered: "It wasn't publicly filed. There was a clause in the SIRVA contract that allowed for us to request that non-LSI variables be removed from the calculations." (Pl. Dep. 212–13.)

In his brief, the Plaintiff cites a plethora of laws governing tax returns, securities, banking, conspiracy, and abandoned property that he believes SIRVA may have violated. However, he does not indicate how he, directly or indirectly, would have been facilitating these acts in his role at LSI and, thus, personally liable. For example, he does not explain what role he could have played in SIRVA's preparation of its SEC filings, tax returns, or customer refunds. In addition to citing these various laws, he contends that, as a "whistleblower" under 18 U.S.C. § 1514A, he was afforded certain protections against wrongful discharge under state law. (Pl. Br. 10.)[7]

_____

[7] Title 18 U.S.C. § 1514A states that certain companies may not discriminate against an employee because the employee provided information to, or cooperated with an investigation by, a person with supervisory authority over the employee, or another person working for the employer who has the authority to investigate, discover, or terminate misconduct, if the information or investigation related to violations of specified statutes, securities regulations, or federal laws related to fraud against shareholders. 18 U.S.C. § 1514A.  Section 1514A(b)(2)(D) states that an action under that statute "shall be commenced not later than 90 days after the date on which the violation occurs." The Plaintiff did not file a claim under Sarbanes-Oxley and is not claiming that he is protected under the administrative scheme set forth in Sarbanes-Oxley. (Pl. Br. 13.) However, he states that he "nevertheless, is protected under the Whistle Blower Act as a person that cannot be retaliated against under state law." (*Id.*) The

In the end, the Plaintiff has not established that he was asked to participate in any illegal act, or that he was required—by any law—to report SIRVA's accounting practices (even assuming for purposes of summary judgment that they were illegal). Therefore, he has not established that he is anything more than a potential "whistle-blower." But whistle-blowers are not included in the narrow exception recognized under Indiana law. *See McClanahan*, 517 N.E.2d at 393 n.1 (distinguishing whistle-blower cases from cases where the employer requires an employee to take action that would violate state criminal laws). Whistle-blower cases are not included in the public policy exception to at-will terminations because, while an employee's reports of his employer's illegal activities would be "advantageous if substantiated," they are not "mandatory under law, unlike compliance with a state's penal code." *Id.* This distinction is fatal to the Plaintiff's claim. He has not pointed to any Indiana court that has extended the wrongful termination exception for the employment at will doctrine to employees whose employment is terminated for whistle blowing or reporting their employer's misdeeds. Nor has any court disagreed with the explicit pronouncement by the Indiana appellate court since *McClanahan* that "good faith whistle blowers are not within the exception." *Wilmington v. Harvest Ins. Cos.*, 521 N.E.2d 953, 955 (Ind. Ct. App. 1988) (citing *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054 (Ind. Ct. App. 1980)); *see also Martin v. Platt*, 386 N.E.2d 1026 (Ind. Ct. App. 1979) (denying an action for retaliatory discharge where terminated employees claimed that their discharge was in retaliation for reporting to company official that supervisor received illegal kickbacks from company suppliers).

---

Plaintiff does not explain this curious contention, but he does go on to address his fear that he could have been exposed to penal consequences for violations of a variety of laws. The Plaintiff appears to combine his arguments regarding whistle blowing with his arguments that remaining silent would have exposed him to personal liability.

The Plaintiff argues that his case is analogous to *McGarrity v. Berlin Metals, Inc.*, 774 N.E.2d 71, 78 (Ind. Ct. App. 2002). In *McGarrity*, the court found that the employee was not a mere whistle-blower. Rather, he was fired as the chief financial officer "for refusing to incur personal liability for felony fraud, filing a fraudulent tax return, failing a corporate responsibility, or a conspiracy to commit any of the former crimes." 774 N.E.2d at 79. The court stressed that Garrity was terminated for his refusal to join in his employer's conduct. *Id.* (distinguishing Garrity from the supervisor in *Wior v. Anchor Indus., Inc.* 669 N.E.2d 172, 177–78 (Ind. 1996), who alleged he was terminated for refusing to fire a subordinate who filed a worker's compensation claim). The Plaintiff implies that he was also fired for refusing to join in illegal conduct. But unlike the plaintiff in *Garrity*, who was required as the CFO to prepare and certify the accuracy of the company's financial statements and its tax returns, the Plaintiff did not have any responsibility for SIRVA's financial records and did not have to verify their accuracy. He did not even work for SIRVA—as an employee or an independent contractor.

The Plaintiff has not established that he was asked to participate in illegal activity, was required to speak out about SIRVA's accounting methods or face personal liability, or that his complaints put him in a protected whistle-blower category. Thus, even if the Plaintiff could establish that SIRVA engaged in illegal activity, and even if he could establish that his termination was related to his complaints about this activity instead of his poor performance, he would not have a cognizable cause of action for retaliatory discharge under the narrow public policy exception to employment at-will. LSI is entitled to judgment on the Plaintiff's retaliatory discharge claim as a matter of law.

**B.      Tortious Interference with Employment Relationship**

The Plaintiff claims that even after he was removed from the SIRVA account, SIRVA pressured LSI to fire him, and that this constitutes a tort under Indiana law. The elements of tortious interference with a contractual relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Bradley v. Hall*, 720 N.E.2d 747, 750 (Ind. Ct. App. 1999).

SIRVA does not dispute that the first two elements are present. SIRVA argues that summary judgment is appropriate because the undisputed facts establish that LSI alone decided to terminate the Plaintiff. They also argue that because the Plaintiff performed so poorly, the Plaintiff cannot establish the absence of justification as required for a valid claim. If SIRVA did not influence LSI's decision, LSI cannot be considered part of a conspiracy to interfere with its own contract with the Plaintiff. The Plaintiff's claim against LSI requires him to prove concerted activity with SIRVA.

In support of its motion for summary judgment, the Defendants present testimony from Drolshagen that he alone, without input from SIRVA, decided to terminate the Plaintiff's employment because he could no longer support his $110,000 salary. The Defendants also point out that the Plaintiff admitted in his deposition that he had no evidence that SIRVA did anything after his November removal from the SIRVA account to cause his termination. The Plaintiff attempts, in his Statement of Genuine Issues, to dispute these facts. The Plaintiff's "evidence," consisting of nothing more than unsupported speculation, fails to create a triable issue whether

28

SIRVA influenced Drolshagen to terminate his employment.

The Plaintiff points to Drolshagen's purported failure to enforce certain clauses of the Contract that allowed adjustments for variables that LSI had no control over as evidence that LSI's poor collection performance was a pretext for his termination. (DE 78, Stmt. Genuine Issues ¶¶ 12, 13.) He claims that the penalty was offset by premature increases in payments from SIRVA. (DE 78, Stmt. Genuine Issues ¶ 12.) He states that Drolshagen told Gathany and LSI that only he would question numbers that LSI did not control and "made threats of termination to anyone who continued to point out SIRVA problems." (DE 78, Stmt. Genuine Issues ¶ 13.) The Plaintiff also argues that, because SIRVA was preparing for a November IPO and financial accounting problems could have derailed or materially impaired the IPO, SIRVA "brought pressure to bear on Drolshagen and McKenna to silence [the Plaintiff] during the critical times in November and December in order to facilitate the IPO." (DE 78, Stmt. Genuine Issues ¶ 14.) He states that the constant communication between Gathany, Loesch, and Bokar at SIRVA and McKenna and Drolshagen at LSI is proximate to his termination. (*Id.*) He then argues that Bokar and Gathany wanted the LSI project to fail because it would enhance their own personal standing at SIRVA and notes that Gathany owned pre-IPO stock. (*Id.*)

In addition to the statements cited above from paragraphs 12, 13, and 14 of his Statement of Genuine Issues, the Plaintiff incorporates, by reference, paragraphs 10 and 11. Paragraph 10, in turn, cites to paragraph 6. In support of the statements made in these 6 paragraphs of his Statement, the Plaintiff provides string citations to his own affidavit, paragraphs 10, 11, 12, 13, 15, 26, 27, 30, 32, 33, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62 and 63. These paragraphs, in turn, refer to numerous exhibits in their

entirety (without pinpoint citation). The Defendants have moved to strike the Plaintiff's appendix, including his affidavit and exhibits attached to it. Rather than address the admissibility of each paragraph, the Court will discuss only those statements that bear on the claim the Plaintiff pursues—that SIRVA interfered with the Plaintiff's employment contract with LSI.

The statement that Drolshagen threatened the Plaintiff with termination is entirely unsupported in the record. The cited portions of the Plaintiff's affidavit do not mention termination. Rather, an email attached to the Plaintiff's affidavit reveals that on June 18, 2003, Drolshagen sent an email to the Plaintiff, McKenna, and another member of LSI management advising that it did not matter whether a particular issue was LSI's or SIRVA's fault, that LSI needed to fix its own problems, and that LSI was going to stop pointing out SIRVA's faults.  He stated that, without exception, no emails were to be sent to SIRVA without his review. He then added that anyone who could replace the money that SIRVA was paying LSI was free to ignore the directive about emails, but that he did not suggest it for anyone else. The email makes no reference to termination or to illegal accounting practices. Moreover, it did not target the Plaintiff, but instead stressed that no one at LSI was to communicate with SIRVA without his permission. Additionally, this directive from Drolshagen was not proximate to the adverse action; it occurred six months before Drolshagen terminated the Plaintiff's employment.

As already discussed, *supra*, the Plaintiff has not presented admissible evidence in support of his argument that SIRVA conspired with LSI "under the guise of enforcing the penalty clause of the Contract and through manipulation of the numbers and scheme by SIRVA alleging poor performance while actually rewarding LSI with additional cash every month in fees." (Pl. Br. 5.) There is no evidence that the cost of living increase was not scheduled or that it

30

would not have been applied in the absence of the penalty. The Plaintiff is not deterred by the fact that Drolshagen terminated four other employees as a cost saving measure to offset the penalty. He simply argues the terminations saved in excess of $350,000 and thus were not necessary to pay the penalty, and were simply a "perpetuat[ion] of the conspiracy." (Pl. Br. 5.) To establish that LSI perpetuated the conspiracy by firing five people, the Plaintiff would have to first establish that a conspiracy existed. However, even assuming that the increased contract fees were premature, he has failed to link the purported cash advancements to any action that SIRVA took to influence LSI to terminate his employment.

In support of his contention that Drolshagen failed to enforce certain contractual clauses, the Plaintiff cites only to his own affidavit. The Court does not consider this an established fact for numerous reasons. First, the Court was required to sift through the 24 cited paragraphs of the Plaintiff's affidavit to locate the paragraph that purportedly supports this statement.[8] Second, the only paragraph that appears to be related to this statement addresses Drolshagen's efforts to avoid the penalty for not meeting the 2003 Benchmark. As part of these efforts, Drolshagen pointed out to SIRVA various contract clauses that both sides neglected to enforce. The evidence of record is that LSI was assessed the penalty. Third, enforcement of contractual clauses is an issue of contract interpretation and the Plaintiff's conclusory remarks are not sufficient to create an issue whether Drolshagen failed to enforce certain provisions of the contract. *Powers v. Dole*, 782 F.2d 689, 695 (7th Cir. 1986) ("Conclusory allegations that have no factual support are

---

[8] Actually, this was true for most of the Plaintiff's contentions. The Plaintiff's Statement of Genuine Issues provides several assertions within each paragraph followed by a string cite to numerous paragraphs of the Plaintiff's nineteen-page affidavit, which, in turn, incorporate pages of exhibit documents. "A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).

insufficient to create a genuine issue of material fact.") Fourth, even assuming that Drolshagen

did not enforce certain contract provisions, the Plaintiff does not explain how Drolshagen's

actions are evidence that SIRVA directed his termination from LSI.[9]

The statements that Gathany and Bokar had incentives for the LSI project to "fail in order

to enhance their own personal standing at SIRVA" is speculative and not supported by specific

facts. The Plaintiff states in his affidavit that Gathany owned over 83,000 shares of SIRVA stock

pre-IPO. (Plf. Aff. ¶ 34.) The Plaintiff does not attempt to lay a foundation of personal

knowledge for this information. He cites to several exhibits, but none of them support this

statement. In paragraph 35 of his affidavit, the Plaintiff states that Gathany told Loesch that the

contract was destined to fail and that if it succeeded, Gathany and Bokar would look bad to

SIRVA upper management. In support of this conversation between Loesh and Gathany, the

Plaintiff attaches unauthenticated notes. There is no indication when the self-titled "timeline"

was written. It appears to be an unsworn document containing the Plaintiff's version of events.

In any event, it does not explain why, even if Gathany and Bokar wanted LSI to fail, they would

have wanted the Plaintiff fired. By all accounts, except his own, the Plaintiff was not succeeding

at reaching the Benchmark.[10]  Moreover, as of November 13, the Plaintiff was no longer working

on the SIRVA project and Doeden was the point person on the account.

The Plaintiff's explanation is that SIRVA, nonetheless, wanted to "silence him." The

---

[9] Again, he speculates that it is evidence of pretext and that the actual reason he was terminated was the result of a conspiracy between LSI and SIRVA. LSI's purported interest in the conspiracy was to keep the SIRVA contract and SIRVA's interest was to avoid criticism of its accounting methods before its IPO. However, he does not provide any evidence that SIRVA was interested in his termination.

[10] Even the Plaintiff admits that LSI was not meeting the Benchmark. He just believes that it was due to SIRVA's accounting practices, not LSI's collection efforts.

Plaintiff invites the Court to speculate that because SIRVA was involved in a pending IPO and the Plaintiff believed that some of its accounting practices violated reporting laws, that SIRVA put pressure on Drolshagen to terminate the Plaintiff's employment.  He does not explain how firing him would keep him quiet; the Plaintiff had no more control over SIRVA's financial reports before he was fired than after he was terminated. He had no less means or opportunity to allege that SIRVA's reports were misleading after his termination from LSI than he did when he worked as a third-party debt collector at LSI. The Plaintiff proffers that the timing of SIRVA's criticism of his performance is "curious with respect to the pending IPO." (Plf. Brief 5.) "An invitation to speculate does not create a genuine factual issue." *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1152 (7th Cir. 1989). In addition, the Plaintiff does not actually offer evidence of suspicious timing because his complaints about the numbers began in early 2003, well before his termination, as did the criticism of LSI's performance under his leadership. He also states that the communication between LSI and SIRVA was proximate to his termination. He has not established how this communication differed from the regular communication that was not proximate to his termination. This communication does not even hint at the conclusion that SIRVA was pressuring LSI to fire the Plaintiff.

The Plaintiff does not offer any evidence from which a reasonable jury could conclude that SIRVA influenced Drolshagen to terminate the Plaintiff's employment. The evidence is that Drolshagen acted on his own to terminate the Plaintiff's employment because he could no longer justify his salary. The Plaintiff's tortious interference claim must be dismissed.

**C.      Counterclaim for Misrepresentations About LSI's Ability to Meet Benchmark**

LSI filed a counterclaim against the Plaintiff to recover $30,000 in bonus payments that he paid in reliance on the Plaintiff's representations that LSI would meet its 2003 Benchmark. LSI argues that the Plaintiff intentionally and negligently made misrepresentations to LSI to obtain the $30,000. LSI has moved for summary judgment on its claim that the Plaintiff negligently misrepresented LSI's performance under the SIRVA account.

There is no independent basis for this Court to exercise jurisdiction over LSI's counterclaim for $30,000. *See* 28 U.S.C. § 1332 (requiring that amount in controversy exceed $75,000). Rather, LSI's counterclaim is supplemental to the Plaintiff's federal claims. 28 U.S.C. § 1367. According to the supplemental jurisdiction statute, a district court may decline to exercise supplemental jurisdiction over these claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). Because this cause of action was originally filed in state court, LSI's counterclaim is remanded to state court and the Court declines to rule on LSI's motion for summary judgment on its counterclaim.

## CONCLUSION AND ORDER

For the foregoing reasons, Defendant Liquidebt Systems, Inc.'s Motion for Summary Judgment [DE 43] is GRANTED in PART. The Court withholds ruling on the Motion [DE 43] as it relates to LSI's counterclaim against the Plaintiff because the counterclaim is REMANDED to state court. Defendant SIRVA's Motion for Summary Judgment [DE 47] is GRANTED. The

Motions to Strike [DE 82, 84] are GRANTED in PART and rendered MOOT in PART.

Judgment will be entered against the Plaintiff and in favor of the Defendants on the claims

brought by the Plaintiff against the Defendants. LSI's counterclaim is remanded to the Allen

County Superior Court.

   SO ORDERED on January 14, 2008.

            s/ Theresa L. Springmann   
           THERESA L. SPRINGMANN
           UNITED STATES DISTRICT COURT